**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **MARY KUMI,** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**UNITED ASSET MANAGEMENT, LLC** )<br>**and FCI LENDER SERVICES, INC.,** )<br>)<br>**Defendants.** )<br>) | **CIVIL ACTION**<br>**FILE NO._____** |

## COMPLAINT

Plaintiff MARY KUMI (hereinafter referred to as "Ms. Kumi" or "Plaintiff") by and through counsel, files her Complaint against the Defendants, UNITED ASSET MANAGEMENT, LLC (hereinafter referred to as "UAM"), and FCI LENDER SERVICES, INC. (hereinafter referred to as "FCI"), respectfully showing the Court the following:

### I.  PRELIMINARY STATEMENT

1.     This Complaint alleges claims against Defendants arising from their improper conduct in connection with the collection of her dormant second mortgage loan, including attempted wrongful foreclosure, breach of contract and

declaratory judgment, and violations of the Fair Debt Collection Practices Act (FDCPA) and the Truth in Lending Act (TILA).  Pursuant to her claims, Ms. Kumi seeks injunctive and declaratory relief, as well as actual and statutory damages, attorney's fees, costs and expenses of litigation, and any further relief the court may deem appropriate.

## II.  JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## III.  PARTIES

4.      Plaintiff Mary Kumi is a citizen and resident of Gwinnett County, Georgia.

5.      Defendant UAM is a mortgage investment company with its principal office in California. At all times relevant hereto, UAM was in the business of purchasing residential mortgage loans in Georgia. UAM may be served with process upon its registered agent, Universal Registered Agents, Inc., 900 Old Roswell Lakes Parkway, Roswell, GA, 30076.

6.      Defendant FCI is a mortgage servicing company with its principal

office in California. At all times relevant hereto, FCI was in the business of servicing residential mortgage loans in Georgia. FCI may be served with process upon its registered agent, Cogency Global Inc., 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA, 30076.

### IV.  FACTS

7.     Ms. Kumi is a 63-year-old, African-American woman who has owned her home in Auburn, Georgia for sixteen years.  This is the only home Ms. Kumi has ever owned.

8.     In November 2005, Ms. Kumi obtained a first and second mortgage from IndyMac Bank, F.S.B. for the purchase of her home.

9.     The originating lender, IndyMac, was a predatory mortgage lender known for making subprime mortgages that included confusing and abusive features that created a high likelihood of foreclosure. As a result, IndyMac collapsed and went into FDIC receivership in 2008.

10.    The first mortgage had an original principal balance of $175,343, with an adjustable interest rate based on the LIBOR index plus a margin of 5.375%, and could increase to as high as 13.5%. Although the first mortgage had a term of 30

years, it provided for Ms. Kumi's payments to cover interest only for the first 10 years, and then increase to an amortizing principal and interest payment for the remaining 20 years. The first mortgage further included a prepayment penalty in order to discourage paying off the loan through sale or refinance in the first two years.

11.     The original principal balance of the second mortgage was $43,836, with an interest rate of 10.875% for a term of 15 years. However, at the end of the 15-year term, the loan called for a balloon payment of $37,028.87. The second mortgage also included a prepayment penalty for the first two years.

12.     Ms. Kumi struggled for several years to stay current on the mortgages. However, by 2010, the payments on the first mortgage had increased substantially and created a significant hardship. Recognizing that she could no longer afford the payments to keep her home, Ms. Kumi decided to walk away and understood that the home would be foreclosed.

13.     In 2013, Ocwen contacted Ms. Kumi and offered her the opportunity to keep her home with an affordable loan modification on her first mortgage. Ms.

Kumi successfully completed the trial payments and obtained a permanent modification with Ocwen, which allowed her to move back into the home.

14.    Following the modification, Ms. Kumi has remained current on her first mortgage payments, and remains current to date.

15.    During the time period of the loan modification, the value of Ms. Kumi's property was significantly depressed, and was likely less than the amount owed on the first mortgage, with no value securing the second.  At the time of the modification with Ocwen, Ms. Kumi had not been receiving any correspondence concerning the second mortgage loan. Ms. Kumi understood that Ocwen had acquired her loan during the period when she thought the property was being foreclosed. She understood that the modification with Ocwen represented a full resolution of her mortgages, and that the second mortgage had either been included in the modification or otherwise written off.

16.    Ms. Kumi does not recall receiving monthly mortgage statements or any other correspondence regarding her second mortgage for approximately 10 years, until in or around May, 2021 and June, 2021, when she was contacted by Defendants.

17.    In May 2021, Ms. Kumi received a "Borrower Welcome Letter" from FCI dated May 10, 2021, stating that the servicing of the "Promissory Note" had been transferred to FCI from Sortis Financial, Inc. effective May 7, 2021. The letter further claimed a debt amount of $87,344.77, including principal of $45,089.90 and accrued interest of $42,254.87.

18.    The May 10, 2021 letter did not indicate that it was in reference to a second mortgage on her property, or provide any identifying information about the original loan terms (such as the origination date, the original lender, or the original loan amount). In addition, Ms. Kumi was not familiar with the prior servicer, Sortis Financial, identified in the letter. Ms. Kumi was genuinely confused and reasonably believed this correspondence to be a scam.

19.    A month later, Ms. Kumi received a "Welcome Letter" from UAM dated June 11, 2021. This letter notified Ms. Kumi that UAM was now the owner of the "2nd lien mortgage" on her property, and that the loan had been sold to UAM more than 3 months earlier, on March 1, 2021. The letter again referenced the previous servicer as being Sortis Financial (with which Ms. Kumi was not familiar), and failed to provide any information to identify the loan (such as the

origination date, original lender, or original loan amount). The notice did not provide any information as to whether the transfer of ownership had been recorded in the public records or where in the public records such transfer would be recorded. Ms. Kumi remained suspicious and confused by this notice, and reasonably believed it to be a scam.

20.    On or around July 28, 2021, UAM sent a letter and proposed agreement for a modification of the second mortgage. The proposed modification agreement provided for a total mortgage balance of $90,537.60, including an interest-bearing balance of $45,000.00, and a deferred principal balance of $42,989.46 representing "unpaid accrued interest."

21.    The July 28th letter stated that if Ms. Kumi did not execute and return the modification within 2 days, by July 30th, then her "loan will be shipped back to its original investor where it's very likely they will refer your loan to foreclosure." This high-pressure tactic demanding her agreement to what appeared to be an inflated loan amount within only 2 days further led Ms. Kumi to suspect the correspondence to be a scam. In addition, the representation that the loan would be

returned to its original investor for foreclosure caused further confusion as to whether UAM actually had any legitimate interest in the account.

22.    Ms. Kumi would have been agreeable and willing to pay the modified payment amount of $299.39 on the interest-bearing balance amount proposed on July 28, 2021. However, she did not sign the modification, and lost the opportunity for the affordable payment amount due to UAM's confusing correspondence that reasonably caused her to question their legitimacy, and due to the improper inclusion of nearly $43,000 in interest for approximately a decade when Ms. Kumi does not recall receiving any statements on the account.

23.    In response to the communications from FCI and UAM, Ms. Kumi contacted PHH, the servicer of her first mortgage, to try to obtain verification as to the status of her second mortgage (due to her understanding that the second mortgage had been previously resolved prior to or at the time of her modification). PHH researched her inquiry and provided a letter dated August 20, 2021, which stated: "Thank you for the recent communication regarding the account referenced above in which you inquired if the second lien is active and the status of the second lien. We are unable to locate the second lien with the Deed amount of $43,836.00."

Ms. Kumi understood from this correspondence and from ongoing conversations with PHH that she did not have a second mortgage on her home.

24.     In or around early August, Defendants referred the loan to foreclosure counsel. The foreclosure firm sent correspondence dated August 11, 2021 demanding that Ms. Kumi cure an alleged default of $49,971.60 within 30 days, and claiming a total balance due of $90,682.97, including interest of $43,212.92.

25.     On or around August 17, 2021, FCI sent the first monthly mortgage statement to Ms. Kumi after acquiring the servicing of the loan in May 2021. This monthly statement was sent after the loan had already been referred to the foreclosure firm. This statement, and subsequent monthly statements, continued to reflect a total payment amount due of over $50,000, including all monthly payments allegedly due from 2010 to the present.

26.     Ms. Kumi continued in her efforts to seek verification of the legitimacy of FCI and UAM to collect on the second mortgage. She contacted OneWest/CIT, which acquired the bulk of IndyMac's assets from FDIC receivership. CIT was only able to tell her that the second mortgage was transferred in 2006, but could not locate any additional information as to the name

of the transferee company. She also contacted Regions Bank, which was the last servicer she dealt with on the second mortgage in 2010. Regions searched for the account using Ms. Kumi's personal identifying information, but was unable to locate any record of the loan in their system.

27.    On or around November 2, 2021, the foreclosure firm sent a notice scheduling Ms. Kumi's home for foreclosure on December 7, 2021.

28.    The foreclosure notice did not identify any entity as having full authority to modify the loan, but provided contact information for FCI as the servicer that could be contacted "to discuss possible alternatives to avoid foreclosure." However, UAM did not delegate loss mitigation or modification matters to FCI as servicer of the loan, but instead required that the borrower contact UAM directly concerning any loss mitigation matters, including modifications, settlements, and short payoffs. UAM was the entity with full authority to negotiate, amend, and modify all terms of the mortgage, and FCI did not have any such authority.

29.    After receiving the foreclosure notice, Ms. Kumi contacted the foreclosure firm for more information about the second mortgage, but was merely told to contact FCI.

30.    Ms. Kumi also went to the Gwinnett County courthouse concerning the foreclosure, and was directed to the deed records. There, she obtained assistance in finding that an assignment had finally been recorded on October 15, 2021, purporting to transfer the second mortgage from IndyMac to UAM. This was the first time she was able to confirm that there was still a second mortgage on her home and that UAM was the record owner of the loan.

31.    After finally being able to confirm in the deed records that UAM was the owner of the second mortgage, Ms. Kumi called FCI and UAM to request that the purported interest charges be removed for the extended period of time that she did not receive statements or notices about the second mortgage, and that she be able to make monthly payments on the principal balance. UAM rejected her pleas.

32.    Ms. Kumi then retained the undersigned counsel at Atlanta Legal Aid, which sent correspondence to the foreclosure firm and FCI on November 17, 2021. The letter to foreclosure counsel disputed the validity of the interest and fees

purportedly accrued during an extended period of time when Ms. Kumi was not receiving monthly mortgage statements or any correspondence about the second mortgage. The letter further expressed Ms. Kumi's willingness and desire to enter into repayment arrangements on the amount validly owed, and requested that the December foreclosure sale be stopped for the correct balance of the loan to be verified and then payment arrangements to be made.

33.    By separate letter dated November 17, 2021, counsel for Ms. Kumi sent a letter to FCI that constituted a Qualified Written Request ("QWR") to a servicer under RESPA, 12 U.S.C. § 2605(e), and a request to correct an error under 12 U.S.C. § 2605(k).  The letter was both a Notice of Error ("NOE") and a Request for Information ("RFI") under RESPA's implementing Regulation X, and was sent to FCI's designated address for QWRs.  The letter notified FCI of errors relating to its demand for exorbitant interest and fees purportedly accrued during periods of time when no statements were being sent to Ms. Kumi concerning the second mortgage. The letter to FCI also requested information relating to the servicing of Ms. Kumi's loan, including, among other items: a copy of the payment and transaction history of the loan; copies of periodic mortgage statements sent to Ms.

Kumi for periods of time in which interest or fees have been charged to the loan; and copies of all notices sent to Ms. Kumi concerning transfer of ownership or transfer of servicing of the loan.

34.     On November 29, 2021, the foreclosure firm provided a response to counsel's letter, which included the note, security deed, copy of the recorded assignment from IndyMac to UAM, copy of the welcome letters from FCI and UAM when they obtained the loan, and updated payoff and reinstatement quotes. However, the response did not include copies of any documents or correspondence reflecting any communications with Ms. Kumi by any previous servicer or owner prior to FCI and UAM's letters in May and June of 2021. Nor did the response include any payment or transaction history to verify the balance claimed due.

35.     Despite counsel's repeated requests, despite having failed to verify the balance claimed due on the loan (half of which is allegedly accrued interest during a decade-long period when Ms. Kumi does not recall receiving any statements for the second mortgage), and despite Ms. Kumi's expressed desire to enter into repayment arrangements once the correct balance can be verified, Defendants have continually refused to stop the December 7, 2021 foreclosure sale.

13

36.     Ms. Kumi has suffered significant emotional distress and mental anguish as a result of Defendants' confusing notices that appeared to be a scam, their efforts to collect inflated retroactive amounts of interest after an extended period of silence concerning the loan, and their failures to verify the accuracy of the balance claimed before proceeding with a foreclosure of Ms. Kumi's home. She is unable to sleep, and the stress has caused her blood pressure (which was previously in a healthy range) to spike to levels requiring medication. Ms. Kumi has been racked with worry and desperate to save her home.

### V. COUNT ONE:
### BREACH OF CONTRACT AND DECLARATORY JUDGMENT:
### UNAUTHORIZED AMOUNTS CHARGED

37.     Ms. Kumi incorporates by reference paragraphs 1-36 above, as if set forth verbatim herein.

38.     Ms. Kumi did not receive monthly mortgage statements or other correspondence concerning her second mortgage for approximately a decade prior to Defendants' communications. She did not understand that she still had a second mortgage on her home, did not receive billing statements to know how much to pay or where to send payments, and did not know who to contact about the loan.

14

39.    On information and belief, Ms. Kumi did not receive periodic mortgage statements concerning the second mortgage because the loan had been charged off. The Truth in Lending Act (TILA) requires that mortgage borrowers be provided with a periodic statement for each billing cycle. 15 U.S.C. § 1638(f) and 12 C.F.R. § 1026.41. However, there is an exception to this requirement for loans that have been charged off, provided that no additional fees or interest will be charged on the account. 12 C.F.R. § 1026.41(e)(6). As Ms. Kumi was not receiving monthly mortgage statements for a period of approximately ten years, it is not permitted for interest or fees to be charged to the loan during that period of time.

40.    On information and belief, the ownership of the loan was transferred more than once during the 16 year period from origination in November 2005 to the recorded assignment to UAM in October 2021. TILA, 12 C.F.R. § 1026.39, requires that each new owner of the loan provide notice to the borrower within 30 days of the assignment.  However, Ms. Kumi did not receive notices of these transfers of ownership, and was thus unaware of the continued existence of the second mortgage debt, or who to contact concerning the loan.

41.     On information and belief, the servicing of the loan was transferred several times during the 16 year period from origination in November 2005 to FCI's welcome letter in May 2021. When the servicing of a mortgage loan is transferred, RESPA, 12 C.F.R. § 1024.33, requires that the transferor and transferee servicers must each send notice at least 15 days before and no more than 15 days after the servicing transfer, respectively. Prior to the welcome letter from FCI, Ms. Kumi had not received any such transfer of servicing notices concerning the second mortgage. She was thus unaware of the continued existence of the second mortgage debt or who to contact concerning the loan.

42.     Ms. Kumi's non-payment on the loan was caused by the conduct of Defendants' predecessors-in-interest, and such alleged default on the loan is thus excused under O.C.G.A. § 13-4-23. Because no correspondence was being provided to Ms. Kumi to notify her as to where payments should be sent or the amount of the payment, this conduct caused Ms. Kumi not to be able to make payments on the loan, or to know about the existence of the loan so as to pursue other options she might have had with regard to the account, and excuses her from performance on the loan during such time period.

43.    Moreover, Defendants' predecessors-in-interest waived Ms. Kumi's payments on the loan and waived interest on the loan through their course of conduct of allowing non-payment without any collection action for over 10 years. Defendants are not entitled to now demand such strict compliance retroactively.

44.    The lack of any communication with Ms. Kumi for such an extended period of time, in violation of TILA and RESPA requirements, constituted such gross negligence as to constitute constructive fraud. This conduct induced Ms. Kumi into a false sense of security, believing that the second mortgage had been resolved at the time of the modification, and receiving no information to the contrary. Ms. Kumi has suffered injury as a result of being misled by such gross negligence. If she had received appropriate communications, she would have been able to take appropriate action, which could have included: stripping off the second mortgage under the Bankruptcy Code during the period of time when her property value was significantly depressed and underwater on the first mortgage; making payment arrangements on the second mortgage to avoid accrual of interest and charges; or refinancing to obtain a lower interest rate on the second mortgage and without an inflated balance. Accordingly, under principles of equitable estoppel,

Defendants are not entitled to collect amounts that could have been avoided if Ms. Kumi had received appropriate notices concerning the second mortgage. O.C.G.A. § 24-14-29.

45.    Under the terms of the mortgage contract, the rights and obligations of the parties are subject to the requirements and limitations of applicable law. Defendants' attempt to collect interest and fees that were not authorized to be charged under federal and state law, as set forth above, thus constituted a breach of contract. As a result of this breach, Ms. Kumi suffered damages resulting from the loss of opportunity to obtain an affordable modified loan payment, which otherwise would have been agreeable if not for Defendants' inclusion of these unauthorized amounts.

46.    Ms. Kumi further requests a declaratory judgment confirming the correct amount validly due on the loan, and eliminating unauthorized interest and fees improperly charged.

## VI. COUNT TWO:
## VIOLATIONS OF THE TRUTH IN LENDING ACT

47.    Ms. Kumi incorporates by reference paragraphs 1-36 above, as if set forth verbatim herein.

48.     TILA, 12 C.F.R. § 1026.39, requires that each new owner of the loan provide notice to the borrower within 30 days following the transfer of ownership. Such notice must "identify the mortgage loan that was sold, assigned or otherwise transferred." The notice must also state "[w]here transfer of ownership of the debt to the covered person is or may be recorded in public records, or, alternatively, that the transfer of ownership has not been recorded in public records at the time the disclosure is provided."

49.     UAM purported to acquire the second mortgage on March 1, 2021. However, UAM failed to send notice of the transfer of ownership to Ms. Kumi within 30 days, in violation of TILA. Instead, UAM waited for more than 3 months, until June 11, 2021 to notify Ms. Kumi that it had acquired the loan.

50.     Furthermore, UAM's notice to Ms. Kumi failed to include all of the information required by 12 C.F.R. § 1026.39. The notice did not appropriately identify the mortgage loan that was sold, referring to it only by reference to "the 2nd lien mortgage," but failing to provide any identifying information about the loan, such as the original date, original loan amount, or original lender. UAM

further failed to provide any information about whether the transfer of ownership had been recorded in the public records or where it would be recorded.

51.     Ms. Kumi suffered harm as a result of UAM's failure to provide proper notice of the transfer of ownership, as required by TILA. UAM's failure to provide identifying information about the mortgage that had been transferred caused Ms. Kumi significant confusion and suspicion as to the validity of UAM's ownership. UAM's failure to send the notice timely, and waiting 3 months before notifying Ms. Kumi of the transfer of ownership, caused Ms. Kumi delay in being able to seek out information to verify the existence of the second mortgage and confirm whether UAM had a valid interest in the loan. Finally, UAM's failure to provide information as to whether the transfer of ownership had been recorded and where it would be recorded in the public record further undermined Ms. Kumi's ability to understand UAM's legal interest in the second mortgage or know where to seek verification of such recorded interest. As a result, Ms. Kumi suffered significant confusion, distress, and fear of losing her home, while remaining uncertain as to whether UAM was a valid entity with which she should make payment arrangements. Ms. Kumi was thus delayed in being able to verify the

legitimacy of UAM's claim to collect the second mortgage in order to try to make payment arrangements, by which time UAM had already initiated foreclosure proceedings.

52.    TILA also requires that Defendants provide periodic statements for each monthly billing cycle. 15 U.S.C. § 1638(f); 12 C.F.R. § 1026.41.

53.    Although UAM purportedly acquired the loan in March 2021, and FCI became the servicer in May 2021, Defendants failed to send monthly statements to Ms. Kumi as required by TILA until August 17, 2021 in connection with the payment due September 1, 2021. In violation of TILA, Defendants failed to send monthly periodic statements for the payments due on June 1, July 1, or August 1, 2021.

54.    Defendants' failure to send monthly mortgage statements for three months, until mid-August, after the loan had already been referred to foreclosure counsel, prevented Ms. Kumi from understanding the nature of Defendants' collection action and further contributed to her impression that their correspondence from May through July was a scam. The failure to send these statements, during a critical period when Defendants were expecting Ms. Kumi to

make payment arrangements, caused Ms. Kumi significant confusion, distress, and uncertainty, and prevented her from fully engaging in an effort to reach an affordable agreement, such as through a loan modification.

55.     As a result of Defendants' violations of TILA, Ms. Kumi is entitled to actual damages, statutory damages of $4,000 per violation, attorney's fees, costs, and litigation expenses.

## VII. COUNT III:
## VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
## AGAINST FCI

56.     Ms. Kumi incorporates by reference paragraphs 1-36 above, as if set forth verbatim herein.

57.     Upon information and belief, FCI uses instrumentalities of interstate commerce and the mails in its business, the principal purpose of which is the collection of debts, and FCI regularly collects or attempts to collect debts owed or due another. As a mortgage servicer, FCI collects mortgage debts on behalf of mortgage holders. FCI collects payments from mortgage borrowers throughout the country, and sends numerous communications by mail in the collection of these debts. Therefore, FCI is a "debt collector" as defined by the FDCPA. 15 U.S.C. §

1692a(6). FCI became the servicer of Ms. Kumi's mortgage when the loan was in default, and therefore does not fall into the exclusion provided in 15 U.S.C. § 1692a(6)(F).

58.    FCI violated the FDCPA, 15 U.S.C. §§ 1692e and 1692f by making false, deceptive, and misleading representations while attempting to collect a debt, and using unfair or unconscionable means to collect a debt.

59.    In all of its correspondence with Ms. Kumi, FCI repeatedly made false representations concerning the amount of the debt, and demanded payment for interest and fees, and purported past due payments, that were not legally authorized.

60.    FCI's attempts to collect amounts not permitted by law also constituted unfair or unconscionable means to attempt to collect a debt.

61.    As a result of the above violations of the FDCPA, Ms. Kumi was harmed. FCI's deceptive correspondence claiming such inflated amounts caused her to suspect FCI of being a scam, and delayed her in exploring options to resolve the amount validly owed. Ms. Kumi also suffered emotional and mental distress each time she received a letter from FCI claiming an astronomical past due balance

and accrued interest that she did not believe she owed. The letters confused her and caused her to worry about the status of the second mortgage. She was anxious and fearful that if she did not pay the improper amount claimed due, she was at risk of losing her longtime home to foreclosure.

62.    As a result of the above violation of the FDCPA, Ms. Kumi is entitled to actual damages, statutory damages of $1,000, attorney's fees, costs, and litigation expenses.

## VIII. COUNT FOUR:
## WRONGFUL ATTEMPTED FORECLOSURE

63.    Ms. Kumi incorporates by reference paragraphs 1-36 above, as if set forth verbatim herein.

64.    O.C.G.A. § 44-14-162.2 requires that a notice to a borrower of the initiation of non-judicial foreclosure proceedings must be sent no later than 30 days before the foreclosure sale date and must include "the name, address, and telephone number of the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with the debtor."

65.    The notice sent by the Defendants' foreclosure law firm on or around November 2, 2021, scheduling Ms. Kumi's home for foreclosure on December 7,

2021, did not identify any individual or entity as having full authority to negotiate, amend, and modify the loan, but instead only provided contact information for FCI as the servicer who could be contacted "to discuss possible alternatives to avoid foreclosure."

66.     However, UAM did not delegate loss mitigation or modification matters to FCI as servicer of the loan, but instead required that UAM be contacted by the borrower directly concerning any loss mitigation matters, including modifications, settlements, and short payoffs. UAM was actually the entity with full authority to negotiate, amend, and modify all terms of the mortgage, and the foreclosure notice improperly identified FCI as the entity to be contacted for options to avoid foreclosure.

67.     Because Defendants' notice of foreclosure failed to comply with the express requirements of O.C.G.A. § 44-14-162.2, should the Defendants proceed with a foreclosure sale on December 7, 2021, that foreclosure would be wrongful.

68.     Section 21 of the Security Deed for this second mortgage requires that, as a condition precedent to acceleration and initiation of foreclosure, the lender must first give written notice to the borrower specifying:  (a) the borrower's

default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given, by which the default must be cured; and (d) that failure to cure the default on or before the date specified may result in acceleration of the sums secured and foreclosure sale of the property.

69.     However, the August 11, 2021 written notice the foreclosure firm sent to Ms. Kumi demanded that Ms. Kumi cure an alleged default of $49,971.60 within 30 days, and claimed a total balance due of $90,682.97, including accrued interest of $43,212.92.

70.     The August 11, 2021 default notice, by demanding an exorbitant amount of improper and unauthorized interest and fees, as described in Count I above, failed to satisfy the requirements of Section 21 of the Security Deed as it did not accurately identify Ms. Kumi's default or the action required to cure the default.  Because the Defendants failed to satisfy a contractual condition precedent to acceleration and foreclosure under the Security Deed, should the Defendants proceed with a foreclosure sale on December 7, 2021, that foreclosure would be wrongful.

71.    O.C.G.A. § 23-2-114 imposes a legal duty upon a foreclosing party under a power of sale to exercise that power fairly and in good faith.

72.    After a decade of silence on the second mortgage, the Defendants:

(a)    reached out to Ms. Kumi in May and June of this year with confusing and misleading correspondence that failed to provide basic information for Ms. Kumi to be able to identify the loan the Defendants were purporting to collect, leaving her understandably suspicious that the notices were a scam;

(b) sent Ms. Kumi a high pressure letter in late July of this year, demanding agreement within only two days to a loan modification with an improperly inflated loan balance and threatening that if she failed to agree, her "loan will be shipped back to its original investor" for foreclosure, further raising questions about whether UAM had any legitimate interest in the loan;

(c) immediately referred the loan to foreclosure counsel in August 2021 when the loan modification was not returned in the two days demanded, while failing to record an assignment of the mortgage to UAM in the

public deed records, where Ms. Kumi could verify UAM's interest, until October 15, 2021; and

(d) failed to verify the accuracy of the balance claimed before proceeding with a foreclosure of Ms. Kumi's home.

73.     This conduct of the Defendants, along with the Defendants' continued demands of exorbitant improper and unauthorized amounts, the Defendants' proceeding with foreclosure despite their issuance of a foreclosure notice that failed to comply with O.C.G.A. § 44-14-162.2, and the Defendants' failure to satisfy a security deed condition precedent to acceleration and foreclosure, constitutes a violation of the Defendants' duty to exercise the power of sale fairly and in good faith.

74.     The scheduled foreclosure sale poses a risk of imminent, irreparable harm to Ms. Kumi, since it would mean the loss of her home and the risk of homelessness.

75.     Ms. Kumi seeks an order enjoining the Defendants from conducting the scheduled foreclosure sale.

76.     Despite counsel's repeated requests, despite having failed to verify the balance claimed due on the loan (half of which is allegedly accrued interest during a decade-long period when Ms. Kumi does not recall receiving any statements for the second mortgage), and despite Ms. Kumi's expressed desire to enter into repayment arrangements once the correct balance can be verified, Defendants have continually refused to stop the December 7, 2021 foreclosure sale.   The above-described conduct authorizes the imposition of punitive damages, pursuant to O.C.G.A. § 51-12-5.1, in that it shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifferent to consequences, and Ms. Kumi seeks such damages.   Moreover, this conduct authorizes Ms. Kumi to seek her attorneys' fees under O.C.G.A. § 13-6-11, and she seeks an award of fees.

## IX. COUNT FIVE:
## ATTORNEYS' FEES

77.     Ms. Kumi incorporates by reference paragraphs 1-36 above, as if set forth verbatim herein.

78.     Defendants insist on proceeding with the foreclosure sale of Ms. Kumi's home, despite having been notified that Ms. Kumi did not receive

statements or other required notices on the second mortgage for approximately a decade, with full knowledge that the validity of the amount claimed is in genuine dispute, and without having completed an investigation or providing any contrary evidence to refute Ms. Kumi's assertions.

79.   Defendants also insist on proceeding with the December 7, 2021 foreclosure sale, despite the clear defect in the foreclosure notice that would make such sale improper and in violation of Georgia law.

80.   Ms. Kumi's counsel has made multiple, repeated requests that the December sale be stopped so that disputed loan balance can be investigated and verified, and reasonable payment arrangements made. However, Defendants continue to refuse to stop the foreclosure.

81.   Defendants' conduct has required Ms. Kumi to file this litigation to protect her rights and her home, causing Ms. Kumi unnecessary trouble and expense.

82.   As described above, the Defendants' conduct shows bad faith and Ms. Kumi therefore seeks her attorneys' fees pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Ms. Kumi respectfully prays for the following relief:

(1) Enjoin Defendants from proceeding with foreclosure of the second mortgage pending the litigation in this matter;

(2) Enter a declaratory judgment that Defendants are not entitled to charge interest and fees during periods when Ms. Kumi was not receiving monthly mortgage statements on the second mortgage, and determining the correct balance due on the loan;

(3) Actual damages, statutory damages under TILA and the FDCPA, attorney's fees and costs;

(4) Judgment in favor of Ms. Kumi awarding costs and litigation expenses;

(5) A trial by jury as provided by law; and

(6) Such other and further relief as the Court deems just and proper.

TRIAL BY JURY DEMANDED

This 3rd day of December, 2021,

/s/ J. Rachel Scott_____
J. Rachel Scott
Georgia Bar No. 253048
Jennifer Rentenbach
Georgia Bar No. 723810
*Counsel for Plaintiff*

31

ATLANTA LEGAL AID SOCIETY, INC.
54 Ellis Street NE
Atlanta, GA 30303
Scott: (404) 614-3986
Rentenbach: (678) 500-7559
Fax: (404) 525-5710
jrscott@atlantalegalaid.org
jrentenbach@atlantalegalaid.org